1   SINGER CASHMAN LLP
      Adam Cashman (Bar. No. 255063)
2     acashman@singercashman.com
      Doug Tilley (Bar No. 265997)
3     dtilley@singercashman.com
    601 Montgomery Street, Suite 1950
4   San Francisco, California  94111
    Telephone:     (415) 500-6080
5   Facsimile:     (415) 500-6080

6   *Attorneys for Eventbrite, Inc.*

7                   UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN COUNTY OF CALIFORNIA

9                      SAN FRANCISCO DIVISION

10

11  EVENTBRITE, INC., a Delaware corporation,      CASE NO. 3:19-CV-04083

12               Plaintiff,                          **COMPLAINT FOR BREACH OF
                                                    CONTRACT AND BREACH OF
12  v.                                              IMPLIED COVENANT OF GOOD
                                                    FAITH AND FAIR DEALING**
13  FAB LORANGER, an individual; TAURUS
    INVESTMENT GROUP INC., a Canadian              **JURY TRIAL DEMANDED**
14  corporation; TAURUS PROJECTS INC., a
    Canadian corporation; TAURUS SITE
15  SERVICES INC., a Canadian corporation; and
    DOES 1 THROUGH 10, inclusive,
16

17               Defendants.

18

19

20

21

22

23

24

25

26

27

28

---

For its complaint against Defendants Fab Loranger ("Loranger"), Taurus Investment Group Inc. ("TIG"), Taurus Projects Inc. ("TP"), Taurus Site Services Inc. ("TSS" and, together with TIG and TP, the "Taurus Entities"), and Does 1 through 10, inclusive (collectively, "Defendants"), Plaintiff Eventbrite, Inc. ("Eventbrite") hereby alleges as follows:

## NATURE OF THE ACTION

1.      This action arises out of what appears to be the Canadian version of the much-publicized Fyre Festival debacle of 2017.  In what may aptly be described as a poorly-orchestrated sequel with lower production values, Defendants here organized and promoted a multi-day music festival called Roxodus Music Fest 2019 ("Roxodus"), which was to have taken place from July 11 through July 14, 2019 at the Edenvale Airport in Stayner, Ontario, Canada.  After obtaining millions in ticket sales, Defendants abruptly canceled the festival on the eve of its commencement, refused to issue refunds, and began blaming the weather, one another, the musical talent, and other bogus "reasons" for the cancellation.  Conspicuously absent from these recriminations and finger-pointing is any effort by Defendants to take responsibility for their willful misconduct or refund any of the millions of dollars they bilked out of their unwitting patrons.

2.      As set forth in greater detail below, acting as agent, on behalf, and in furtherance of the interests of the other Defendants, Loranger executed a series of agreements to induce Eventbrite (a) to promote and sell to its users tickets, passes, and other credentials to Roxodus, and (b) to pay the proceeds of those sales to MF Live, Inc. ("MF Live"), an entity controlled by Loranger, in advance of the Roxodus festival.  In the earliest of those agreements (the "Services Agreement"), Loranger committed that MF Live would refund customers in the event Roxodus was cancelled.  Loranger further committed that if MF Live failed to issue refunds in such case, Eventbrite was authorized to issue refunds on MF Live's behalf, in which event MF Live would promptly repay Eventbrite in full.

3.      Loranger subsequently executed another written contract (the "Guaranty Agreement") personally guaranteeing that MF Live would perform all of its obligations under the Eventbrite Services Agreement and agreements incorporated by reference therein, including with respect to repaying Eventbrite for any refunds issued on MF Live's behalf in the event of cancellation.

4. On July 3, 2019—after Eventbrite had sold approximately $5.8 million Canadian dollars ("CAD") (over $4.3 million United States dollars ("USD")) in credentials to Roxodus and transferred virtually all of that sum to Defendants per the parties' agreements—MF Live announced via its website that it was cancelling Roxodus. MF Live initially promised to provide information concerning refunds, but never did so. Instead, MF Live removed any reference to refunds from its website, leaving customers in the lurch.

5. Beginning fewer than two hours after that announcement, Eventbrite repeatedly demanded that Defendants issue refunds to all customers, many of whom had paid hundreds or thousands of dollars for their Roxodus tickets and credentials. Defendants refused to meaningfully respond, much less to issue refunds as required by the parties' agreements.

6. On or about July 6, 2019, Eventbrite issued a public statement explaining that "[w]e believe attendees deserve to get their money back now, so we have set up an Eventbrite-funded Fan Relief Program to make all Roxodus ticket holders whole while we continue to aggressively pursue the return of funds from the festival's creators. We are transferring funds to ticket holders immediately and they can expect to see it reflected on their credit card or bank statement within seven business days."

7. Between July 5 and 8, 2019, pursuant to its agreements with Loranger, Eventbrite paid approximately $5.2 million CAD (over $3.8 million USD) out of its own coffers to ensure its users did not suffer additional harm at Defendants' hands. Defendants are contractually and legally obligated to reimburse Eventbrite for these expenditures and other damages Eventbrite has incurred in the course of protecting its customers from further harm caused by Defendants' bad faith and unlawful conduct.

## PARTIES

8. Plaintiff Eventbrite is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 155 5th Street, 7th Floor, San Francisco, California 94103. Eventbrite is a global leader in the field of event promotion, ticketing, and associated technology, powering live experiences in 170 countries around the world. Eventbrite's

1    technology platform integrates components needed to seamlessly plan, promote, and produce live

2    events while reducing friction and costs, increasing reach, and driving ticket sales.

3         9.      Upon information and belief, Defendant Loranger is a Canadian citizen, residing in

4    Niagara on the Lake, Ontario, Canada.

5         10.     Upon information and belief, Defendant Taurus Investment Group Inc. is a

6    corporation registered in the province of Alberta, Canada, with its principal place of business at

7    11401–85 Avenue, Fort Saskatchewan, Alberta, T8L 0A9, Canada.

8         11.     Upon information and belief, the shares of TIG are owned and/or controlled by

9    Defendant Loranger, either directly or through intermediary entities such as the other Taurus Entities,

10   such that there exists a unity of interests between at least Loranger and TIG.

11        12.     Upon information and belief, on behalf and in furtherance of the interests of the other

12   Defendants, in late 2018, TIG purchased a 172-acre parcel adjacent to Edenvale Aerodrome for $2

13   million Canadian, and provided other significant capital, resources, and/or support to Defendants in

14   connection with the failed Roxodus festival.

15        13.     Moreover, upon information and belief, at least Loranger acted as an agent, on behalf,

16   and in furtherance of the interests of TIG in committing the acts complained of herein.

17        14.     Upon information and belief, Defendant Taurus Projects Inc. is a corporation

18   registered in the province of Alberta, Canada, with its principal place of business at 11401–85

19   Avenue, Fort Saskatchewan, Alberta, T8L 0A9, Canada.

20        15.     Upon information and belief, the shares of TP are owned and/or controlled by

21   Defendant Loranger, either directly or through intermediary entities such as the other Taurus Entities,

22   such that there exists a unity of interests between at least Loranger and TP.

23        16.     Upon information and belief, at least Defendant Loranger acted as an agent, on behalf,

24   and in furtherance of the interests of TP in committing the acts complained of herein.  For example,

25   Defendant Loranger used a TP-issued email address, fab@taurusprojects.ca, to communicate with

26   Eventbrite personnel regarding payments, logistical and other matters relating to Roxodus.

27        17.     Moreover, upon information and belief, at least Loranger acted as an agent, on behalf,

28   and in furtherance of the interests of TP in committing the acts complained of herein.

18.     Upon information and belief, Defendant Taurus Site Services Inc. is a corporation registered in the province of Alberta, Canada, with its principal place of business at 11401–85 Avenue, Fort Saskatchewan, Alberta, T8L 0A9, Canada.

19.     Upon information and belief, the shares of TSS are owned and/or controlled by Defendant Loranger, either directly or through intermediary entities such as the other Taurus Entities, such that there exists a unity of interests between at least Loranger and TP.

20.     On or around June 26, 2019, Loranger directed that Eventbrite send advance payments from Roxodus ticket sales to a bank account that is, upon information and belief, owned by TSS.

21.     Moreover, upon information and belief, at least Loranger acted as an agent, on behalf, and in furtherance of the interests of TSS in committing the acts complained of herein.

22.     The true names or capacities, whether individual, corporate, association, or otherwise, of the Defendants named herein as Does 1 through 10, inclusive, are unknown to Eventbrite, who therefore sues them by such fictitious names.  Eventbrite is informed and believes, and on that basis alleges, that each of the Doe Defendants are either (a) responsible in some manner, whether directly or indirectly, for the unlawful conduct alleged in this Complaint and the resulting harm to Eventbrite, and/or (b) the recipient and/or other holder of assets obtained on behalf of and/or transferred by one or more other Defendants for the purposes of evading a judgment for the acts for which Eventbrite seeks relief.  Eventbrite will seek leave of Court to amend this Complaint to insert the true names and capacities of Does 1 through 10 when the same have been ascertained, and to join such Doe Defendants in this action.

23.     Upon information and belief, at all times relevant to this Complaint, each Defendant was the agent, servant, employee, owner, manager, operator, director, shareholder, alter-ego, and/or joint venturer of every other Defendant, and at all times relevant times were acting within the scope and course of said agency, employment, ownership, fiduciary, joint venture, or other relationship, with knowledge, permission, and consent of all other Defendants to commit the acts complained of herein.

## JURISDICTION AND VENUE

24.     This action arises under a written contract between Eventbrite and Loranger (who at all times was acting as agent, on behalf of, or in furtherance of the interests of the other Defendants), as well as the statutory and common law of the State of California.

25.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).  There exists complete diversity of citizenship between Eventbrite and each Defendant.  The amount in controversy—at least $5.2 million Canadian (over $3.8 million USD), plus interest, attorneys' fees, and other sums due and owing by contract and by law—far exceeds the minimum required amount in controversy.

26.     This Court has personal jurisdiction over Eventbrite because Eventbrite maintains its principal place of business within this State and this District.

27.     This Court has personal jurisdiction over Loranger because, in executing the Guaranty Agreement at issue in this action, Loranger "irrevocably consent[ed] to the jurisdiction of the State of California, and agrees that any court of competent jurisdiction sitting in San Francisco County, State of California, shall be an appropriate and convenient place of venue, and shall be the sole place of venue, to resolve any dispute with respect to this Agreement."

28.     In addition, upon information and belief, Loranger has purposefully availed himself of the benefits of doing business within the State of California, including by entering into contracts with California residents as well as soliciting and selling goods or services to residents of California, whether directly or through intermediary entities such as MF Live, which activities include numerous instances of Loranger's purposeful availment of this forum to conduct the very business out of which this action arises.

29.     This Court has personal jurisdiction over each of the Taurus Entities because, upon information and belief, they have purposefully availed themselves of the benefits of doing business within the State of California, including by entering into contracts with California residents as well as soliciting and selling goods or services to residents of California, whether directly or through intermediaries such as Loranger.

30.     For example, as part of his negotiations with Eventbrite regarding the advancement of monies collected by Eventbrite in connection with the sales of tickets and credentials for the Roxodus festival, Loranger sought to have Eventbrite deposit at least portions of such monies to an account owned or controlled by one or more of the Taurus Entities.

31.     Loranger also directed at least one of the Taurus Entities to allow a large parcel of real estate to be used as part of the proposed festival, which was highly material to the festival's planned physical location and viability, and consequently, Eventbrite's agreement to help Loranger promote and sell tickets and credentials to the Roxodus festival.

32.     In addition, each of the Taurus Entities is subject to the personal jurisdiction of this Court based on Loranger's conduct toward and contacts with California, because each of them is the agent and/or alter-ego of each Taurus Entity for purposes of this litigation.

33.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3) (in the alternative), and (c), because a substantial part of the events giving rise to Eventbrite's claims occurred in this District, and because Defendants are subject to personal jurisdiction here.

## INTRADISTRICT ASSIGNMENT

34.     For purposes of Civ. L.R. 3-2(c), 3-2(d), and 3-5(b), Eventbrite respectfully submits that this action should be assigned to the San Francisco division of this Court because a substantial part of the events or omissions which give rise to Eventbrite's claims occurred in San Francisco county.

## FACTUAL ALLEGATIONS

### I.     EVENTBRITE'S RELATIONSHIPS WITH DEFENDANTS, AND THE APPLICABLE CONTRACTS

35.     This case concerns the failed Roxodus Music Festival 2019 that Defendants conceived and promoted, and then abruptly cancelled after receiving over $5.5 million CAD (over $4.1 million USD) from Eventbrite's users—none of which has been returned by Defendants as required by contract and governing law.

36.     On November 13, 2018, Loranger caused MF Live to enter into the Services Agreement, a written contract pursuant to which Eventbrite would promote and sell to its users

tickets, passes, and other credentials to Roxodus.  The Services Agreement incorporates by reference the terms of Eventbrite's Terms of Service ("TOS"), Merchant Agreement, Organizer Refund Policy Requirements, and other binding contracts.

37.     Eventbrite's agreements with event organizers such as MF Live typically provide that Eventbrite will sell tickets to the organizer's event, receive funds directly from ticket purchasers, and remit sales proceeds (less Eventbrite's fees, a reserve to protect against chargebacks, and similar sums) to the organizer following completion of the event.

38.     In some cases, organizers may request, and Eventbrite may agree, to advance to the organizer portions of ticket sales proceeds prior to completion of the event to avoid a cancellation.

39.     At Loranger's request, MF Live and Eventbrite agreed to such an arrangement here, namely, that Eventbrite would advance to MF Live ticket sales proceeds, up to a certain cap and subject to certain restrictions, prior to completion of Roxodus.

40.     In late 2018 and early 2019, MF Live and Loranger began to request that Eventbrite increase the cap applicable to advances of ticket proceeds.  In consideration of Eventbrite's agreement to increase that cap, on January 29, 2019, Loranger executed the Guaranty Agreement.

41.     The Merchant Agreement—which is incorporated by reference into the Services Agreement executed by MF Live, and performance of which is secured by the Guaranty Agreement executed by Loranger—provides in relevant part as follows (with all emphases added):

- "Organizer agrees to unconditionally accept, honor and fulfill all ticketing, registration, merchandise and donation commitments that have been confirmed by Eventbrite through the Services" (§ 4.1(c));

- Where organizer opts to have Eventbrite collect ticket proceeds directly from customers for subsequent transmission to the organizer, "Organizer agrees that in its role as limited agent, **Eventbrite is authorized to …** (iii) **issue refunds to Consumers as set forth in Section 4.4** below…" (§ 4.3(c));

- In the event of advances of ticket proceeds, "Organizer also acknowledges and accepts its obligations under Section 4.3(g) and 4.4(c) of the Merchant Agreement**, including its obligations to reimburse Eventbrite for refunds** and credit card chargebacks" (§ 4.3(d));

- **If payments have already been made to an Organizer for a cancelled event, Organizer will immediately refund to a payment address designated by Eventbrite all such payments upon cancellation of such event for the purpose of effecting refunds if refunds are being made under Section 4.4.**  You are responsible for complying with the requirements

of Section 4.4 and the requirements of the Organizer Refund Policy Requirements which are in addition to and are incorporated into the Terms of Service by reference. **If you do not remit funds to Eventbrite that are sufficient to cover refunds due to Consumers for an event cancellation or nonperformance, including, but not limited to, any mandatory refunds under Section 4.4(c) below, then you acknowledge and agree that the amount of such funds shortfall will become due and owing from you to u**s under these Terms of Service, including this Merchant Agreement, until you have satisfied the amount in full and such amounts are also subject to the provisions of Sections 4.4(f) and 4.5 of this Agreement" (§ 4.3(e))

- **"Organizer agrees to communicate a refund policy to Consumers with respect to each event** posted on the Services that meets the requirements of the Organizer Refund Policy Requirements **and to administer such policy in accordance with its terms.** The Organizer Refund Policy Requirements are incorporated by reference into this Merchant Agreement" (§ 4.4(a));

- "Consistent with the Consumer Refund Policy Requirements**, refunds that you are responsible for due to the cancellation or nonperformance of an event are subject to the following refund requirements**:

  - (i) In the event of a full or partial event cancellation, **Organizer agrees to issue refunds to Consumers either by using backup funding sources within the Eventbrite platform (e.g. additional security sources), or by remitting funds due for refunds back to Eventbrite so that refunds can be processed by Eventbrite on the Organizer's behalf**.

  - (ii) If Organizer elects to remit funds back to Eventbrite so that Eventbrite can process refunds on Organizer's behalf, **Organizer must remit funds to Eventbrite that are sufficient to cover refunds due to Consumers within 5 days of the cancellation of the event.**

  - (iii) Organizer will provide clear instructions and contact information to Consumers so that Consumers can make refund requests, or, alternatively, Organizer will turn on the in-product refund request function within the Eventbrite platform and respond to any Consumer refund requests received.

  - (iv) Organizer acknowledges that Eventbrite reserves the right to charge the Organizer for the cost of charge backs related to the cancelled event, and such amounts are also subject to the provisions of Sections 4.4(f) and 4.5 of this Agreement" (§ 4.4(a));

- **"Mandatory Refunds**. Notwithstanding the foregoing, **Organizer authorizes Eventbrite to make refunds in the following situations** … (iii) **Attendees are unable to attend the event** due to failure of the Organizer to adequately plan for capacity, ingress or egress, or attendance will otherwise subject the Consumer to safety concerns; (iv) **Eventbrite believes in its discretion that specific orders should be refunded under the Organizer's posted refund policy or Eventbrite's Organizer Refund Policy Requirements**… (v) Eventbrite believes in its discretion that the refund request, if not granted, will lead to a chargeback that Eventbrite is more likely than not to lose; [or] (vi) Organizer failed to list a refund policy on the applicable event page and Eventbrite believes in its discretion that a refund would be reasonable under the circumstances… **Organizer also authorizes Eventbrite to make refunds** of any and all

orders (including those for unrelated events) **if** (A) **Eventbrite believes in its discretion that Organizer has engaged in any fraudulent activity or made any misrepresentations; (B) Eventbrite believes in its discretion that there is substantial risk of nonperformance by Organizer with respect to the applicable event** or future events; [or] (C) Eventbrite believes in its discretion that it is likely to receive complaints, refund requests, transaction reversals and/or chargebacks with respect to a substantial amount of orders" (§ 4.4(c));

- "Because all sales are ultimately made by Organizers, **Organizer hereby agrees to promptly and fully reimburse Eventbrite and its affiliates upon demand for refunds that Eventbrite makes pursuant to this Merchant Agreement,** other than to the extent that the necessity for such refunds is caused by Eventbrite's negligence or willful misconduct. Organizer acknowledges and agrees that chargebacks will result in losses to Eventbrite in excess of the amount of the underlying transaction and that **by refunding transactions in advance of a chargeback Eventbrite is mitigating such losses and its damages with respect to Organizer's breach** of this Merchant Agreement. **If you do not remit funds to Eventbrite that are sufficient to cover mandatory refunds as described by this Section 4.4(c) for an event cancellation or nonperformance, then you acknowledge and agree that the amount of such funds shortfall will become due and owing from you to us** under the Terms of Service, including this Merchant Agreement, until you have satisfied the amount in full and such amounts are also subject to the provisions of Sections 4.4(f) and 4.5 of this Agreement" (*Id.*); and

- Late payments are subject to compounding interest, and Eventbrite is entitled to attorneys' fees and other costs of collection in the event MF Live refused to honor its payment obligations (§§ 4.5(a), (b)).

42. The Guaranty Agreement executed by Loranger states: **"Guarantor unconditionally and irrevocably guarantees (on a continuing basis as primary obligor) the timely performance of all present and future obligations, liabilities and agreements required to be performed or paid by Organizer under the Services Agreement,** and agrees to pay all reasonable costs, fees and expenses incurred by the Eventbrite relating to the enforcement of Eventbrite's rights hereunder (collectively, the "Obligations"). The obligations of Guarantor under this paragraph are independent of the Obligations, and separate actions may be brought against Guarantor and Organizer (and/or Guarantor may be joined in any action against Organizer). Without limiting the generality of the foregoing, **in the event that Organizer is unable to repay the Early Sales Settlements in full pursuant to the terms of the Services Agreement, Guarantor hereby guarantees to repay such Early Sales Settlements in full"** (emphases added).

## II.   DEFENDANTS DISHONESTLY PROMOTE—AND THEN DISHONESTLY CANCEL—ROXODUS, LEAVING ARTISTS, FANS, VENDORS, AND OTHERS IN THE LURCH

43.     At all relevant times prior to July 3, 2019, at least Loranger, acting as agents, on behalf, and in furtherance of the interests of the other Defendants, falsely represented to the public that Roxodus would be a "once in a lifetime experience" featuring, among other high-end attractions, (a) famous musical artists, including Aerosmith, Lynyrd Skynyrd, Nickelback, Kid Rock, Peter Frampton, Billy Idol, Blondie, Alice Cooper, and others; (b) a "Celebrity Chef Culinary Experience" showcasing dishes prepared by renowned chefs Massimo Capra and Lynn Crawford; (c) several tiers of RV-based, "glamping," and other overnight accommodations; and (d) games and rides for children.

44.     Relying on Defendants' misrepresentations concerning the Roxodus experience, Eventbrite, a global leader in event promotion and ticketing solutions, sold its users in excess of $5.8 million CAD (over $4.3 million USD) in Roxodus tickets, parking passes, accommodations packages, and other credentials.

45.     Pursuant to the Services Agreement and Guaranty Agreement, Eventbrite transferred over $5.5 million CAD (over $4.1 million USD) to MF Live in advance of Roxodus.

46.     Roxodus, however, never came to pass.  On July 3, 2019, MF Live announced via its website, roxodus.com, that Roxodus would be cancelled.  MF Live stated that "[d]uring the past couple of months, our venue at Edenvale Airport has battled tremendous rainy weather that has impacted our ability to produce the festival….   Our team has worked tirelessly to find a solution in which the show can go on but unfortunately, we could not make it happen this year. Our dream of producing a 'once in a lifetime experience' has been put on hold as we take the much-needed time to nurture our venue into a premier landmark in Ontario."[1]  While MF Live's initial announcement advised that MF Live would issue full refunds to those who purchased tickets and other credentials, any mention of refunds or other relief has been stricken from the Roxodus website.

---

[1]     roxodus.com (last visited July 10, 2019).

47.     Upon information and belief, MF Live's justification for cancelling Roxodus, like Defendants' previous claims regarding the "once in a lifetime experience" they intended to offer, was a lie.

48.     Numerous sources—including interviews with Loranger's business partner Mike Dunphy ("Dunphy"), MF Live's Manager of Operations, and others who worked with or for Defendants on Roxodus, as well as third party witnesses and weather service reports—confirm that weather was not the issue.

49.     For example, The Weather Network reports the following total rainfall in Stayner: 114 millimeters (less than 4.5 inches) in April 2019[2]; 87.4 millimeters (less than 3.5 inches) in May 2019[3]; 49.9 millimeters (less than 2 inches) in June 2019[4]; and 0.4 mm (one one-hundredth of an inch) in July 2019, as of the date of this filing[5].

50.     Upon information and belief, even if there had been "tremendous rainy weather" in the months preceding Roxodus—and there was not—the show still could have gone on.  In an interview with iHeartRADIO published on July 7, 2019, Andreas Tzembelicos, who sold to Defendant TIG a 172-acre parcel of land which was to form part of the Roxodus festival grounds, explained that the land he sold to TIG for Roxodus consisted largely of "asphalt."[6]  Asphalt is not negatively impacted by a few inches of rain.

51.     Indeed, in a video interview with CTV News published on July 8, 2019, Dunphy denied that rainy weather prevented Roxodus, stating: "In my opinion, the festival grounds would

---

[2]     *See* The Weather Network historical weather data for Stayner, Ontario, Canada for April 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=4&dispt=calendar-container-monthly (last visited July 10, 2019).
[3]     See The Weather Network historical weather data for Stayner, Ontario, Canada for May 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=5&dispt=calendar-container-monthly (last visited July 10, 2019).
[4]     See The Weather Network historical weather data for Stayner, Ontario, Canada for June 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=6&dispt=calendar-container-monthly (last visited July 10, 2019).
[5]     See The Weather Network historical weather data for Stayner, Ontario, Canada for July 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=7&dispt=calendar-container-monthly (last visited July 15, 2019).
[6]     *See* iHeartRADIO video and report: "Roxodus Music Fest's Mike Dunphy: 'I Took Nothing[,];" available at http://www.iheartradio.ca/news/roxodus-music-fest-s-mike-dunphy-i-took-nothing-1.9433859 (last visited July 10, 2019).

have been ready to go."[7]   Dunphy further stated that "[a]t no time did I ever think that this was not going to move ahead.  Ever.  I was shocked just like everyone else when the announcement was made that it was not going to move forward."[8]

52.     In a video interview with CityNews, Bill Roberts, former Manager of Operations for Roxodus, also confirmed that Roxodus was cancelled because of Defendants' incompetence and infighting, not the weather.  Mr. Roberts explained: "They didn't have enough time to plan, enough time to get the grounds ready.  They didn't have a proper staff in place."[9]  Mr. Roberts continued, "[w]e needed something like 27 construction office trailers for, like, offices, dressing rooms, wardrobe rooms, stuff like that.  No one had them because they were already booked out.  We needed hundreds and hundreds of pieces of equipment to come in here.  And I was, in the middle of May, trying to order all this stuff, trying to find it."[10]

53.     Roxodus was not a rain-out, as Defendants claim.  The truth is that they simply lacked the experience, preparation, work ethic, skill, and dedication necessary to deliver on their promises.

54.     Upon information and belief, as of the time Roxodus was cancelled: Defendants had secured only one of approximately twelve permits necessary to lawfully convene Roxodus; construction on the Roxodus site was in disarray; necessary site preparation and accommodations equipment had not been secured; and there existed additional substantial logistical obstacles, including that local Highway 26—the sole route into or out of the Roxodus site—was incapable of handling even a fraction of the traffic Roxodus would have created.

55.     In short, in order to unjustly enrich themselves, Defendants lied to the public, Eventbrite, the artists who were to perform at Roxodus, food and hospitality vendors, and countless others.

---

[7]     *See* CTV News report:  "'I was shocked like everyone else': Roxodus co-creator breaks silence[,]" available at https://barrie.ctvnews.ca/i-was-shocked-like-everyone-else-roxodus-co-creator-breaks-silence-1.4499510 (last visited July 10, 2019).
[8]     *Id.*
[9]     *See* CityNews video and report:  "Roxodus Music Festival doomed months ago: former staffer[,]" available at https://winnipeg.citynews.ca/video/2019/07/09/roxodus-music-festival-doomed-months-ago-former-staffer/  (last visited July 11, 2019).
[10]     *Id.*

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
CASE NO. 3:19-CV-04083

### III.    EVENTBRITE'S EFFORTS TO MAKE AGGRIEVED FANS WHOLE

56.    On July 3, 2019—within two hours of Defendants' announcement that Roxodus was cancelled—Eventbrite wrote MF Live personnel, including Loranger, stating:  "I'm really sorry to hear that you had to cancel the festival.  Since you have already received Eventbrite payouts for your events, you will need to wire transfer the funds you have been paid out to date back to us so we can process the refunds for your event in bulk.  Please initiate a wire transfer to our account (details below).  After funds are sent please provide me with a wire confirmation receipt.  The amount to wire back is **$5,181,502.11 CAD"** (emphasis in original).

57.    In the afternoon of July 3, 2019, Eventbrite's Trust and Safety Team—the internal group tasked with protecting Eventbrite and its users from fraud and other harm—emailed additional MF Live personnel, stating:  "When an event is cancelled, it's important to keep your attendees up to date and decide on a game-plan for handling refunds as soon as possible.  Given the large number of attendees affected we need to come up with a game plan to wire funds back to us, attendee communication and timeline for refunds."  Eventbrite advised that "Refunds need to be timely in order to avoid attendee contact and chargebacks."  Eventbrite instructed MF Live to "1.  **Email your attendees** to notify them of the cancellation and plan for refunds. [Other Eventbrite personnel previously] provided you with template to send to emails to attendees in product regarding the cancellation and outlining the refund plan.  2.  **Refund the orders** [other Eventbrite personnel previously] provided the wire details with the amount owed to Eventbrite.  3.  **Reply to this email** with the timeline for when you will send a more extensive email to attendees regarding refunds and when funds will be wired to Eventbrite to action those refunds on your behalf.  As you may recall, Eventbrite's Attendee Refund Requirements mandate refunds in certain circumstances, including the cancellation of an event.  We understand that cancelling event is not an easy decision to make and we want to work with you to reach a swift and positive resolution" (emphases in original).

58.    In the evening of July 3, 2019, Eventbrite wrote a third time to Loranger and other MF Live personnel, stating: "As we stated before, we would really like to keep this process of getting attendees refunded moving along as quickly as possible. The hope is always that an event organizer facing cancellation will make good on its obligations to consumers who purchased tickets. Is MF

Live able do so?  If so, we need the details of planned communications and refund timeline. If not, we need the following details so that we can collaborate together in quickly resolving this to avoid attendee issues.  When are you sending attendee communications regarding refunds? What will these communications say?  Is MF Live solvent?  Does MF Live plan to have Eventbrite issue refunds on its behalf and will MF Live be sending funds to Eventbrite simultaneously? If not simultaneously, what is the potential timeline we're looking at?"  Eventbrite made clear that "[w]e need to know this information as soon as possible so that we can determine whether and how Eventbrite would step in to issue refunds on MF Live's behalf for the event…. Prompt response to this is very important. I am happy to collaborate with you and your legal team on this, but we'd really like to keep Eventbrite's legal team out of this if possible.  To do that, we need information from you today."

59.     Defendants did not substantively respond to Eventbrite's communications, other than to refer the matter to legal counsel.

60.     On July 5, 2019, Eventbrite issued a letter to Defendants, stating: "We understand that MF Live Inc. and Taurus Site Services Inc. ('Your Company') has now cancelled the events referred to as Roxodus Music Fest 2019….  While we had hoped you would make good on your obligations to consumer who purchased registrations to the Cancelled Event to avoid legal liability for Your Company, its officers, directors, and investors, including, without limitation, consumer lawsuits and attorney general investigations which are fairly typical in these circumstances, **it now seems necessary for Eventbrite to step in an issue refunds on your behalf for the Cancelled Event**.  On 7/10/2019, it will be 7 days from the cancellation of the Cancelled Event, providing you far more than enough time to make good on your obligations" (emphasis added).  Invoking Section 4.4(c) of the Merchant Agreement, Eventbrite advised that "**Eventbrite has the authority to issue refunds on your behalf.  We will exercise that right on 7/10/2019 with respect to the cancelled Event… You will owe Eventbrite $5,181,502.11 CAD following our issuing of all refunds**" (emphasis added).

61.     Eventbrite received no substantive response from Defendants.

62.     On or about July 6, 2019, Eventbrite announced publicly that "[a]fter multiple attempts to communicate and secure funds back from the Roxodus organizers, they have provided no

1   indication that they will refund ticket holders.  We believe attendees deserve to get their money back

2   now, so we have set up an Eventbrite-funded Fan Relief Program to make all Roxodus ticket holders

3   whole while we continue to aggressively pursue the return of funds from the festival's creators.  We

4   are transferring funds to ticket holders immediately and they can expect to see it reflected on their

5   credit card or bank statement within seven business days."

6   63.   As of the date of this filing, Eventbrite has paid approximately $5.2 million CAD

7   (over $3.8 million USD) of its own funds to make sure its users did not suffer additional harm at

8   Defendants' hands.  Eventbrite is entitled to recover that sum, with interest, and reasonable attorneys'

9   fees, from Defendants.

10   **FIRST CAUSE OF ACTION**

11   **(AGAINST ALL DEFENDANTS)**

12   **(BREACH OF GUARANTY AGREEMENT)**

13   64.   Eventbrite re-alleges and incorporates by reference the above paragraphs of this

14   Complaint as though fully set forth herein.

15   65.   On or about January 29, 2019, Eventbrite and Loranger entered into the Guaranty

16   Agreement.

17   66.   The Guaranty Agreement, and all materials incorporated therein by reference, is a

18   valid and binding contract.  The Guaranty Agreement is subject to agreed-upon confidentiality

19   restrictions.  For that reason, the Agreement is not appended to this Complaint.

20   67.   Eventbrite did all, or substantially all, of the material things that the Guaranty

21   Agreement required it to do.  To the extent Eventbrite did not perform any material obligation under

22   the Guaranty Agreement, it was excused from having to do so and/or such obligation was waived by

23   Loranger.  Eventbrite therefore satisfied any and all conditions required under the Agreement for

24   Loranger's performance.

25   68.   Loranger failed to perform his obligations under the Guaranty Agreement, and/or

26   engaged in conduct that was prohibited by the Guaranty Agreement.  Among other breaches

27   occurring within the four years preceding this Complaint, Loranger failed to reimburse Eventbrite for

28

1  substantial monies paid by Eventbrite to users who purchased Roxodus credentials that were rendered

2  worthless due to Defendants' decision to cancel Roxodus.

3      69.    Eventbrite was harmed as a result of Loranger's breaches, in an amount to be proved

4  at trial.

5      70.    Loranger's breach of contract was a substantial factor in causing Eventbrite's harm.

6      71.    Eventbrite is therefore entitled to recover all damages attributable to Loranger's

7  breach, with interest thereon.

8      72.    Eventbrite is further entitled to recover from Loranger its reasonable attorneys' fees

9  incurred in connection with this action, pursuant to the Services Agreement.

10     73.    Eventbrite is entitled, moreover, to collect damages, interest, and reasonable attorneys'

11  fees from the other Defendants because (a) Loranger acted as agent, on behalf, and/or in furtherance

12  of the interests of each such Defendant in entering into and then subsequently breaching the Guaranty

13  Agreement, as evidenced by, among other things, Loranger's efforts to divert ticket sales proceeds to

14  an account held by certain of the Taurus Entities; and/or (b) upon information and belief, those

15  Defendants are alter-egos of Loranger, who exercises dominion over them, has caused them to be

16  insufficiently capitalized such that they cannot meet their legal obligations, and has otherwise acted

17  in such a manner that refusing to pierce the corporate veil so as to reach such Defendants' assets

18  would result in fraud or injustice to Eventbrite.

### SECOND CAUSE OF ACTION

### (PLEADED IN THE ALTERNATIVE, AGAINST ALL DEFENDANTS)

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN GUARANTY AGREEMENT)

19

20

21

22

23     74.    Eventbrite re-alleges and incorporates by reference the above paragraphs of this

Complaint as though fully set forth herein.

24

25     75.    On or about January 29, 2019, Eventbrite and Loranger entered into the Guaranty

26  Agreement.

27

28

COMPLAINT FOR BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
CASE NO. 3:19-CV-04083

76.     The Guaranty Agreement, and all materials incorporated therein by reference, is a valid and binding contract.  The Guaranty Agreement is subject to agreed-upon confidentiality restrictions.  For that reason, the Agreement is not appended to this Complaint.

77.     Eventbrite did all, or substantially all, of the material things that the Guaranty Agreement required it to do.  To the extent Eventbrite did not perform any material obligation under the Guaranty Agreement, it was excused from having to do so and/or such obligation was waived by Loranger.  Eventbrite therefore satisfied any and all conditions required under the Guaranty Agreement for Loranger's performance.

78.     Within the four years preceding this Complaint, Loranger unfairly interfered with Eventbrite's right to receive the benefits of the Guaranty Agreement, including by failing to reimburse Eventbrite for substantial monies paid by Eventbrite to users who purchased Roxodus credentials that were rendered worthless due to Defendants' decision to cancel Roxodus.

79.     Eventbrite was harmed as a result of Loranger's breaches, in an amount to be proved at trial.

80.     Loranger's conduct was a substantial factor in causing Eventbrite's harm.

81.     Eventbrite is therefore entitled to recover all damages attributable to Loranger's breach, with interest thereon.

82.     Eventbrite is further entitled to recover from Loranger its reasonable attorneys' fees incurred in connection with this action, pursuant to the Guaranty Agreement.

83.     Eventbrite is entitled, moreover, to collect damages, interest, and reasonable attorneys' fees from the other Defendants because (a) Loranger acted as agent, on behalf, and/or in furtherance of the interests of each such Defendant in entering into and then subsequently breaching the Guaranty Agreement, as evidenced by, among other things, Loranger's efforts to divert ticket sales proceeds to an account held by certain of the Taurus Entities; and/or (b) upon information and belief, those Defendants are alter-egos of Loranger, who exercises dominion over them, has caused them to be insufficiently capitalized such that they cannot meet their legal obligations, and has otherwise acted in such a manner that refusing to pierce the corporate veil so as to reach such Defendants' assets would result in fraud or injustice to Eventbrite.

## **PRAYER FOR RELIEF**

WHEREFORE, Eventbrite respectfully prays for relief as follows:

(a)    That the Court enter judgment in favor of Eventbrite, and against each Defendant, on each cause of action;

(b)    An award of damages adequate to compensate Eventbrite for its losses, together with pre- and post-judgment interest and costs, in an amount according to proof;

(c)    An award of attorneys' fees and costs; and

(d)    Such other costs and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Eventbrite hereby demands a trial by jury as to all issues so triable in this action.

Date:  July 16, 2019

Respectfully submitted,

SINGER CASHMAN LLP

By: _____

Adam S. Cashman
Doug Tilley
*Attorneys for Eventbrite, Inc.*