1  SINGER CASHMAN LLP
     Adam Cashman (Bar. No. 255063)
2    acashman@singercashman.com
     Doug Tilley (Bar No. 265997)
3    dtilley@singercashman.com
   601 Montgomery Street, Suite 1950
4  San Francisco, California  94111
   Telephone:     (415) 500-6080
5  Facsimile:     (415) 500-6080

6  *Attorneys for Eventbrite, Inc.*

7                   UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN COUNTY OF CALIFORNIA

9                     SAN FRANCISCO DIVISION

10

11 | EVENTBRITE, INC., a Delaware corporation, | CASE NO. 3:19-CV-04083-LB |
|---|---|
|                    Plaintiff, | **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING; FRAUDULENT TRANSFER; CONSTRUCTIVE FRAUDULENT TRANSFER; INTENTIONAL MISREPRESENTATION; NEGLIGENT MISREPRESENTATION; FRAUDULENT CONCEALMENT; AND MONEY HAD AND RECEIVED** |
| v. | |
| FAB LORANGER, an individual; TAURUS SITE SERVICES INC., a Canadian corporation; TAURUS PROJECTS INC., a Canadian corporation; TAURUS INVESTMENT GROUP INC., a Canadian corporation; and DOES 1 THROUGH 10, inclusive, | |
|                    Defendants. | DEMAND FOR JURY TRIAL |

For its first amended complaint against Defendants Fab Loranger ("Loranger"), Taurus Site Services Inc., Taurus Projects Inc., and Taurus Investment Group Inc. (together with Taurus Site Services Inc. and Taurus Projects Inc., "Taurus" or the "Taurus Entities"), and Does 1 through 10, inclusive (collectively, "Defendants"), Plaintiff Eventbrite, Inc. ("Eventbrite") hereby alleges as follows:

**NATURE OF THE ACTION**

1.      This action arises out of what appears to be the Canadian version of the much-publicized Fyre Festival debacle of 2017.  In what may aptly be described as an unwelcome sequel with lower production values, Defendants here organized and promoted a multi-day music festival called Roxodus Music Fest 2019 ("Roxodus"), which was to have taken place from July 11 through July 14, 2019 at the Edenvale Airport in Stayner, Ontario, Canada.

2.      Defendants abruptly canceled the Roxodus festival on the eve of its commencement, after obtaining millions of dollars from Eventbrite in the form of advances on ticket sales. Defendants continued to receive such advances after they *knew* that Roxodus would not happen—a fact they withheld from Eventbrite even as they watched advance payments roll in.

3.      After cancelling the festival just days before it was to open, Defendants proffered a number of false and shifting excuses for the cancellation after bilking music fans out of millions. First they blamed the weather.  Then they blamed the musical talent.  Then they blamed one another. At no time did any Defendant seek to accept responsibility for their willful misconduct, to refund so much as a single dollar to any ticket-buyer, or to reimburse Eventbrite—as required by law—for the monies Eventbrite paid out to make those aggrieved ticket-buyers whole.

4.      None of that is surprising given information that has recently come out regarding Defendants' prior course of conduct.  For example, Defendants systematically stripped MF Live, Inc. ("MF Live"), the entity dominated by Loranger and formed for the sole purported purpose of putting on Roxodus, of virtually all of its assets.  Specifically, Defendants transferred to the Taurus Entities nearly *all* of the millions of dollars Eventbrite had advanced to MF Live.  Defendants did so through Loranger—who is the *sole* director and/or controlling shareholder of both MF Live and each of the Taurus Entities—as well as through the direct involvement of several Taurus officers, including its

1  President Claude Jeddry, Controller Kaley Smith, Accounting Supervisor Janice Allin, and others.

2  Having siphoned off nearly everything of value, and leaving nothing for Eventbrite or hundreds of

3  other creditors (including musical artists, individuals, small businesses, and Canadian municipal

4  entities), Defendants put MF Live into bankruptcy in Canada within days of cancelling Roxodus.

5       5.     According to materials made available in MF Live's bankruptcy proceedings,

6  including a Statement of Affairs signed under oath by Loranger, Eventbrite is by several orders of

7  magnitude the largest non-insider, arm's-length creditor of MF Live.

8       6.     The facts are as straightforward as they are shameful.  As set forth in greater detail

9  below, acting as agent, on behalf, and in furtherance of the interests of the other Defendants,

10 Loranger executed a series of agreements to induce Eventbrite (a) to promote and sell tickets, passes,

11 and other credentials to Roxodus, and (b) to advance the proceeds of those sales to MF Live in

12 advance of the Roxodus festival.  In the earliest of those agreements (the "Services Agreement"),

13 Loranger committed that MF Live would refund customers in the event Roxodus was cancelled.

14 Loranger further committed that if MF Live failed to issue refunds in such case, Eventbrite was

15 authorized to issue refunds on MF Live's behalf, in which event MF Live would promptly repay

16 Eventbrite in full.  In exchange, Eventbrite agreed to advance to MF Live up to a certain amount in

17 ticket sales prior to the event (the "Advance Cap").

18      7.     In order to induce Eventbrite to increase the Advance Cap—and thus extract more

19 money from Eventbrite at a time when Eventbrite and the general public still believed the festival

20 would go forward—Loranger subsequently executed another written contract (the "Guaranty

21 Agreement").  In the Guaranty Agreement, Loranger personally guaranteed that MF Live would

22 perform all of its obligations under the Services Agreement and agreements incorporated by reference

23 therein, including by repaying Eventbrite for any refunds issued on MF Live's behalf in the event of

24 cancellation.

25      8.     Acting as agent, on behalf, and in furtherance of the interests of the other Defendants,

26 Loranger took additional steps to induce Eventbrite to further increase the Advance Cap, which

27 Eventbrite agreed to do in reliance on Loranger's categorical guarantees of protection and payment.

28

9.      Between November 23, 2018 and June 26, 2019, Eventbrite transferred approximately $5.2 million Canadian dollars ("CAD") ($3.9 million United States dollars ("USD")) to MF Live in reliance on Defendants' representations, including in the Services Agreement and Guaranty Agreement.

10.     Upon information and belief, including based on materials made available in the course of MF Live's bankruptcy proceedings, the vast majority of the monies advanced by Eventbrite to MF Live were systematically transferred by Loranger to his various Taurus Entities. Specifically, in the months preceding the cancellation of Roxodus, ***Defendants caused MF Live to transfer approximately $4.9 million CAD to the Taurus Entities***. Because MF Live had no other assets to speak of, these transfers to Taurus (a) were intended to hinder, delay, and/or defraud Eventbrite, and (b) caused MF Live to become insolvent and/or deepened MF Live's existing insolvency, and left MF Live unable to pay the money it owed to Eventbrite pursuant to contract.

11.     Upon information and belief, Defendants employed several methods to so enrich the Taurus Entities. As set forth in greater detail below, Loranger and other MF Live personnel, acting on behalf and for the benefit of the other Defendants, directed Eventbrite to deposit advance funds into a bank account that was actually owned and/or otherwise controlled by Taurus. Upon information and belief, at all relevant times, Loranger knew that Roxodus would not be held, and that neither he nor MF Live would honor their contractual obligations to issue refunds (or reimburse Eventbrite for refunds issued on their behalf). Yet Loranger withheld these material facts and continued to instruct Eventbrite to send additional payments to Taurus.

12.     Even with respect to advances paid by Eventbrite to MF Live that were not routed directly to a Taurus-controlled bank account, Defendants were anxious to transfer such funds to Taurus as quickly as possible. For example, communications between MF Live, Taurus, and banking personnel demonstrate that Defendants were seeking to transfer such advance payments to Taurus immediately upon receipt from Eventbrite: "**We just need to coordinate it in such a way that as soon as the cheques are cleared as Eventbrite may still be depositing funds regularly. The withdrawal needs to happen quickly**!" (Emphasis added.)

13.     On July 3, 2019—after Eventbrite had sold approximately $5.8 million CAD (over $4.3 million USD) in tickets and credentials to Roxodus and transferred the lion's share of that sum to Defendants per the parties' agreements—MF Live announced via its website that it was cancelling Roxodus.  MF Live initially promised to provide information concerning refunds, but never did so. Instead, MF Live removed any reference to refunds from its website and left its customers in the lurch.

14.     Beginning fewer than two hours after that announcement, Eventbrite repeatedly demanded that Defendants issue refunds to all customers, many of whom had paid hundreds or thousands of dollars for their Roxodus tickets and credentials.  Defendants refused to meaningfully respond, much less to issue refunds as required by the parties' agreements.

15.     On or about July 6, 2019, Eventbrite issued a public statement explaining that "[w]e believe attendees deserve to get their money back now, so we have set up an Eventbrite-funded Fan Relief Program to make all Roxodus ticket holders whole while we continue to aggressively pursue the return of funds from the festival's creators. We are transferring funds to ticket holders immediately and they can expect to see it reflected on their credit card or bank statement within seven business days."

16.     Between July 5 and 8, 2019, pursuant to its agreements with Loranger, Eventbrite paid approximately $5.4 million CAD (over $4 million USD) out of its own coffers to ensure its users did not suffer additional harm at Defendants' hands.  Defendants are contractually and legally obligated to reimburse Eventbrite for these expenditures and other damages Eventbrite has incurred in the course of protecting its customers from further harm caused by Defendants' bad faith and unlawful conduct.

## PARTIES

17.     Plaintiff Eventbrite is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 155 5th Street, 7th Floor, San Francisco, California 94103.  Eventbrite is a global leader in the field of event promotion, ticketing, and associated technology, powering live experiences in 170 countries around the world.  Eventbrite's

singer
cashman LLP

1    technology platform integrates components needed to seamlessly plan, promote, and produce live

2    events while reducing friction and costs, increasing reach, and driving ticket sales.

3        18.    Upon information and belief, Defendant Loranger is a Canadian citizen, residing in

4    Niagara on the Lake, Ontario, Canada.

5        19.    Upon information and belief, Loranger is the sole director and/or controlling

6    shareholder of MF Live.

7        20.    Upon information and belief, Defendant Taurus Site Services Inc. ("TSS") is a

8    corporation registered in the province of Alberta, Canada, with its principal place of business at

9    11401–85 Avenue, Fort Saskatchewan, Alberta, T8L 0A9, Canada.

10        21.    Upon information and belief, Loranger is the sole director of TSS.

11        22.    Upon information and belief, at least a controlling portion of the shares of TSS are

12    owned and/or controlled by Loranger, either directly or through intermediary entities such as the

13    other Taurus Entities, such that there exists a unity of interests between at least Loranger and TSS.

14        23.    Moreover, upon information and belief, Loranger acted as an agent, on behalf, and in

15    furtherance of the interests of TSS in committing the acts complained of herein.

16        24.    Upon information and belief, Loranger directed that Eventbrite send advance

17    payments from Roxodus ticket sales to a bank account owned and/or otherwise controlled by TSS.

18        25.    Upon information and belief, including materials made available as part of MF Live's

19    bankruptcy proceedings, between inception of the contractual relationship between Eventbrite and

20    MF Live and the date on which Roxodus was cancelled, Loranger directed that at least $4.8 million

21    CAD (comprised primarily if not exclusively of funds advanced by Eventbrite) be transferred from

22    MF Live to TSS.

23        26.    Upon information and belief, Defendant Taurus Projects Inc. is a corporation

24    registered in the province of Alberta, Canada, with its principal place of business at 11401–85

25    Avenue, Fort Saskatchewan, Alberta, T8L 0A9, Canada.

26        27.    Upon information and belief, Loranger is the sole director of TP.

28.    Upon information and belief, at least a controlling portion of the shares of TP are owned and/or controlled by Defendant Loranger, either directly or through intermediary entities such as the other Taurus Entities, such that there exists a unity of interests between Loranger and TP.

29.    Upon information and belief, Loranger acted as an agent, on behalf, and in furtherance of the interests of TP in committing the acts complained of herein.  For example, Defendant Loranger used a TP-issued email address, fab@taurusprojects.ca, to communicate with Eventbrite personnel regarding payments, logistical matters, and other issues relating to Roxodus.

30.    Moreover, upon information and belief, including materials made available in the course of MF Live's bankruptcy proceedings, between inception of the contractual relationship between Eventbrite and MF Live and the date on which Roxodus was cancelled, Loranger caused more than $100,000 CAD (comprised primarily if not exclusively of funds advanced by Eventbrite) to be transferred from MF Live to TP.

31.    Upon information and belief, Defendant Taurus Investment Group Inc. is a corporation registered in the province of Alberta, Canada, with its principal place of business at 11401–85 Avenue, Fort Saskatchewan, Alberta, T8L 0A9, Canada.

32.    Upon information and belief, Loranger is the sole director of TIG.

33.    In addition, upon information and belief, a controlling portion of the shares of TIG are owned and/or controlled by Defendant Loranger, either directly or through intermediary entities such as the other Taurus Entities, such that there exists a unity of interests between Loranger and TIG.

34.    Upon information and belief, on behalf and in furtherance of the interests of the other Defendants, in late 2018, Loranger caused TIG to purchase a 172-acre parcel adjacent to Edenvale Aerodrome for approximately $2.25 million CAD, and provide other significant capital, resources, and/or support to Defendants in connection with the failed Roxodus festival.

35.    Moreover, upon information and belief, Loranger acted as an agent, on behalf, and in furtherance of the interests of TIG in committing the acts complained of herein.

36.    Upon information and belief, including materials made available in the course of MF Live's bankruptcy proceedings, between inception of the contractual relationship between Eventbrite and MF Live and the date on which Roxodus was cancelled, Loranger caused thousands of dollars

1  CAD (comprised primarily if not exclusively of funds advanced by Eventbrite) to be transferred from

2  MF Live to TIG.

3       37.    The true names or capacities, whether individual, corporate, association, or otherwise,

4  of the Defendants named herein as Does 1 through 10, inclusive, are unknown to Eventbrite, who

5  therefore sues them by such fictitious names.  Eventbrite is informed and believes, and on that basis

6  alleges, that each of the Doe Defendants are either (a) responsible in some manner, whether directly

7  or indirectly, for the unlawful conduct alleged in this Complaint and the resulting harm to Eventbrite,

8  and/or (b) the recipient and/or other holder of assets obtained on behalf of and/or transferred by one

9  or more other Defendants for the purposes of evading a judgment for the acts for which Eventbrite

10  seeks relief.  Eventbrite will seek leave of Court to amend this Complaint to insert the true names and

11  capacities of Does 1 through 10 when the same have been ascertained, and to join such Doe

12  Defendants in this action.

13  <u>**JURISDICTION AND VENUE**</u>

14       38.    This action arises under a written contract between Eventbrite and Loranger (who at

15  all times was acting as agent, on behalf of, or in furtherance of the interests of the other Defendants),

16  as well as the statutory and common law of the State of California.

17       39.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a).  There exists

18  complete diversity of citizenship between Eventbrite and each Defendant.  The amount in

19  controversy—at least $5.4 million CAD ($4 million USD), plus interest, attorneys' fees, and other

20  sums due and owing by contract and by law—far exceeds the minimum required amount in

21  controversy.

22       40.    This Court has personal jurisdiction over Eventbrite because Eventbrite maintains its

23  principal place of business within this State and this District.

24       41.    This Court has personal jurisdiction over Loranger because, in executing the Guaranty

25  Agreement at issue in this action, Loranger "irrevocably consent[ed] to the jurisdiction of the State of

26  California, and agree[d] that any court of competent jurisdiction sitting in San Francisco County,

27  State of California, shall be an appropriate and convenient place of venue, and shall be the sole place

28  of venue, to resolve any dispute with respect to this Agreement."

42.     In addition, upon information and belief, Loranger has purposefully availed himself of the benefits of doing business within the State of California, including by entering into contracts with California residents as well as soliciting and selling goods or services to residents of California, whether directly or through intermediary entities such as MF Live, which activities include numerous instances of Loranger's purposeful availment of this forum to conduct the very business out of which this action arises.

43.     This Court has personal jurisdiction over each of the Taurus Entities because, upon information and belief, they have purposefully availed themselves of the benefits of doing business within the State of California, including by entering into contracts with California residents as well as soliciting and selling goods or services to residents of California, whether directly or through intermediaries such as Loranger.

44.     For example, as part of his negotiations with Eventbrite regarding the advancement of monies collected by Eventbrite in connection with the sales of tickets and credentials for the Roxodus festival, Loranger sought to have Eventbrite deposit such monies to an account owned or controlled by one or more of the Taurus Entities.  Loranger also orchestrated the transfer of monies advanced by Eventbrite to his Taurus Entities at a time when Loranger knew or  reasonably should have known that the Roxodus festival would not proceed, and that the funds advanced by Eventbrite would need to be refunded to Eventbrite (or to ticketholders directly).  Despite this knowledge, Loranger and the Taurus Entities continued to benefit from Eventbrite's unwitting advancement of funds to MF Live, at which point Loranger promptly took custody of those funds and funneled them to his Taurus Entities.  At no point did Loranger or the Taurus Entities on whose behalf he was acting inform Eventbrite that it should cease making advancements to MF Live, or that refunds would not issue in the event the Roxodus festival was cancelled, despite their knowledge that Eventbrite was relying on Loranger's representations that the festival would proceed as planned.

45.     Loranger also directed at least one of the Taurus Entities to allow a large parcel of real estate to be used as part of the proposed festival, which was highly material to the festival's viability and, consequently, Eventbrite's agreement to help Loranger promote and sell tickets and credentials to the Roxodus festival.

46.     In addition, each of the Taurus Entities is subject to the personal jurisdiction of this Court based on Loranger's conduct toward and contacts with California, because Loranger is the agent and/or alter-ego of each such Taurus Entity for purposes of this litigation.  As set forth herein, Loranger is the sole director and/or controlling shareholder of each Taurus Entity.  In such capacity, Loranger has at all relevant times dominated the operations and affairs of each Taurus Entity. Moreover, as alleged in greater detail throughout this First Amended Complaint, Loranger has at all relevant times acted on behalf, in furtherance of the interests of each Taurus Entity, including by engaging in a pattern of acts specifically designed to funnel funds advanced by Eventbrite into Taurus.

47.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3) (in the alternative), and (c), because a substantial part of the events giving rise to Eventbrite's claims occurred in this District, and because Defendants are subject to personal jurisdiction here.

### INTRADISTRICT ASSIGNMENT

48.     For purposes of Civ. L.R. 3-2(c), 3-2(d), and 3-5(b), Eventbrite respectfully submits that this action should remain assigned to the San Francisco division of this Court because (a) a substantial part of the events or omissions which give rise to Eventbrite's claims occurred in San Francisco county, and (b) this action has already been assigned to the San Francisco division.

### FACTUAL ALLEGATIONS

**I.     EVENTBRITE'S RELATIONSHIPS WITH DEFENDANTS, AND THE APPLICABLE CONTRACTS**

49.     This case concerns the failed Roxodus Music Festival 2019 that Defendants conceived and promoted, and then abruptly cancelled after misappropriating approximately $5.2 million CAD ($3.9 million USD) from Eventbrite's users—none of which has been returned by Defendants as required by contract and governing law.

50.     On November 13, 2018, Loranger caused MF Live to enter into the Services Agreement, a written contract pursuant to which Eventbrite would promote and sell to its users tickets, passes, and other credentials to Roxodus.  The Services Agreement incorporates by reference

the terms of Eventbrite's Terms of Service ("TOS"), Merchant Agreement, Organizer Refund Policy Requirements, and other binding contracts.

51.     Eventbrite's agreements with event organizers such as MF Live generally provide that Eventbrite will sell tickets to the organizer's event, receive funds directly from ticket purchasers, and remit sales proceeds (less Eventbrite's fees, a reserve to protect against chargebacks, and similar sums) to the organizer following completion of the event.

52.     In some cases, organizers may request, and Eventbrite may agree, to advance to the organizer portions of ticket sales proceeds prior to completion of the event to avoid a cancellation.

53.     At Loranger's request, MF Live and Eventbrite agreed to such an arrangement here, namely, that Eventbrite would advance to MF Live ticket sales proceeds, up to an Advance Cap and subject to certain restrictions, prior to completion of Roxodus.

54.     In late 2018, MF Live and Loranger began to request that Eventbrite increase the cap applicable to advances of ticket proceeds.  In consideration of Eventbrite's agreement to increase that cap, on January 29, 2019, Loranger executed the Guaranty Agreement.

55.     The Merchant Agreement—which is incorporated by reference into the Services Agreement executed by MF Live, and performance of which is secured by the Guaranty Agreement executed by Loranger—provides in relevant part as follows (with all emphases added):

- "Organizer agrees to unconditionally accept, honor and fulfill all ticketing, registration, merchandise and donation commitments that have been confirmed by Eventbrite through the Services" (§ 4.1(c));

- Where organizer opts to have Eventbrite collect ticket proceeds directly from customers for subsequent transmission to the organizer, "Organizer agrees that in its role as limited agent, **Eventbrite is authorized to … (iii) issue refunds to Consumers as set forth in Section 4.4** below…" (§ 4.3(c));

- In the event of advances of ticket proceeds, "Organizer also acknowledges and accepts its obligations under Section 4.3(g) and 4.4(c) of the Merchant Agreement, **including its obligations to reimburse Eventbrite for refunds** and credit card chargebacks" (§ 4.3(d));

- **If payments have already been made to an Organizer for a cancelled event, Organizer will immediately refund to a payment address designated by Eventbrite all such payments upon cancellation of such event for the purpose of effecting refunds if refunds are being made under Section 4.4.**  You are responsible for complying with the requirements of Section 4.4 and the requirements of the Organizer Refund Policy Requirements which are in addition to and are incorporated into the Terms of Service by reference. **If you do not remit**

funds to Eventbrite that are sufficient to cover refunds due to Consumers for an event cancellation or nonperformance, including, but not limited to, any mandatory refunds under Section 4.4(c) below, then you acknowledge and agree that the amount of such funds shortfall will become due and owing from you to u**s** under these Terms of Service, including this Merchant Agreement, until you have satisfied the amount in full and such amounts are also subject to the provisions of Sections 4.4(f) and 4.5 of this Agreement" (§ 4.3(e))

- **"Organizer agrees to communicate a refund policy to Consumers with respect to each event** posted on the Services that meets the requirements of the Organizer Refund Policy Requirements **and to administer such policy in accordance with its terms.** The Organizer Refund Policy Requirements are incorporated by reference into this Merchant Agreement" (§ 4.4(a));

- "Consistent with the Consumer Refund Policy Requirements**, refunds that you are responsible for due to the cancellation or nonperformance of an event are subject to the following refund requirements**:

  - (i) In the event of a full or partial event cancellation, **Organizer agrees to issue refunds to Consumers either by using backup funding sources within the Eventbrite platform (e.g. additional security sources), or by remitting funds due for refunds back to Eventbrite so that refunds can be processed by Eventbrite on the Organizer's behalf**.

  - (ii) If Organizer elects to remit funds back to Eventbrite so that Eventbrite can process refunds on Organizer's behalf**, Organizer must remit funds to Eventbrite that are sufficient to cover refunds due to Consumers within 5 days of the cancellation of the event.**

  - (iii) Organizer will provide clear instructions and contact information to Consumers so that Consumers can make refund requests, or, alternatively, Organizer will turn on the in-product refund request function within the Eventbrite platform and respond to any Consumer refund requests received.

  - (iv) Organizer acknowledges that Eventbrite reserves the right to charge the Organizer for the cost of charge backs related to the cancelled event, and such amounts are also subject to the provisions of Sections 4.4(f) and 4.5 of this Agreement" (§ 4.4(a));

- **"Mandatory Refunds**. Notwithstanding the foregoing, **Organizer authorizes Eventbrite to make refunds in the following situations** … (iii) **Attendees are unable to attend the event** due to failure of the Organizer to adequately plan for capacity, ingress or egress, or attendance will otherwise subject the Consumer to safety concerns; (iv) **Eventbrite believes in its discretion that specific orders should be refunded under the Organizer's posted refund policy or Eventbrite's Organizer Refund Policy Requirements**… (v) Eventbrite believes in its discretion that the refund request, if not granted, will lead to a chargeback that Eventbrite is more likely than not to lose; [or] (vi) Organizer failed to list a refund policy on the applicable event page and Eventbrite believes in its discretion that a refund would be reasonable under the circumstances… **Organizer also authorizes Eventbrite to make refunds** of any and all orders (including those for unrelated events) **if** (A) **Eventbrite believes in its discretion that Organizer has engaged in any fraudulent activity or made any misrepresentations; (B)**

**Eventbrite believes in its discretion that there is substantial risk of nonperformance by Organizer with respect to the applicable event** or future events; [or] (C) Eventbrite believes in its discretion that it is likely to receive complaints, refund requests, transaction reversals and/or chargebacks with respect to a substantial amount of orders" (§ 4.4(c));

- "Because all sales are ultimately made by Organizers**, Organizer hereby agrees to promptly and fully reimburse Eventbrite and its affiliates upon demand for refunds that Eventbrite makes pursuant to this Merchant Agreement**, other than to the extent that the necessity for such refunds is caused by Eventbrite's negligence or willful misconduct. Organizer acknowledges and agrees that chargebacks will result in losses to Eventbrite in excess of the amount of the underlying transaction and that **by refunding transactions in advance of a chargeback Eventbrite is mitigating such losses and its damages with respect to Organizer's breach** of this Merchant Agreement. **If you do not remit funds to Eventbrite that are sufficient to cover mandatory refunds as described by this Section 4.4(c) for an event cancellation or nonperformance, then you acknowledge and agree that the amount of such funds shortfall will become due and owing from you to us** under the Terms of Service, including this Merchant Agreement, until you have satisfied the amount in full and such amounts are also subject to the provisions of Sections 4.4(f) and 4.5 of this Agreement" (*Id.*); and

- Late payments are subject to compounding interest, and Eventbrite is entitled to attorneys' fees and other costs of collection in the event MF Live refused to honor its payment obligations (§§ 4.5(a), (b)).

56.     The Guaranty Agreement executed by Loranger states:  **"Guarantor unconditionally and irrevocably guarantees (on a continuing basis as primary obligor) the timely performance of all present and future obligations, liabilities and agreements required to be performed or paid by Organizer [MF Live] under the Services Agreement,** and agrees to pay all reasonable costs, fees and expenses incurred by the Eventbrite relating to the enforcement of Eventbrite's rights hereunder (collectively, the 'Obligations'). The obligations of Guarantor under this paragraph are independent of the Obligations, and separate actions may be brought against Guarantor and Organizer (and/or Guarantor may be joined in any action against Organizer). Without limiting the generality of the foregoing, **in the event that Organizer is unable to repay the Early Sales Settlements in full pursuant to the terms of the Services Agreement, Guarantor hereby guarantees to repay such Early Sales Settlements in full"** (emphases added).

## II.   DEFENDANTS DISHONESTLY PROMOTE—AND THEN DISHONESTLY CANCEL—ROXODUS, LEAVING ARTISTS, FANS, VENDORS, AND OTHERS IN THE LURCH

57.     At all relevant times prior to July 3, 2019, Loranger, acting as an agent on behalf, and in furtherance of the interests of the other Defendants, falsely represented to the public that Roxodus would be a "once in a lifetime experience" featuring, among other high-end attractions, (a) famous musical artists, including Aerosmith, Lynyrd Skynyrd, Nickelback, Kid Rock, Peter Frampton, Billy Idol, Blondie, Alice Cooper, and others; (b) a "Celebrity Chef Culinary Experience" showcasing dishes prepared by renowned chefs Massimo Capra and Lynn Crawford; (c) several tiers of RV-based "glamping" and other overnight accommodations; and (d) games and rides for children.

58.     Relying on Defendants' misrepresentations concerning the Roxodus experience, Eventbrite, a global leader in event promotion and ticketing solutions, sold its users approximately $5.8 million CAD (over $4.3 million USD) in Roxodus tickets, parking passes, accommodations packages, and other credentials.

59.     Pursuant to the Services Agreement and Guaranty Agreement, Eventbrite transferred approximately $5.2 million CAD ($3.9 million USD) to MF Live in advance of Roxodus.

60.     Roxodus, however, never came to pass.  On July 3, 2019, MF Live announced via its website, roxodus.com, that Roxodus would be cancelled.  MF Live stated that "[d]uring the past couple of months, our venue at Edenvale Airport has battled tremendous rainy weather that has impacted our ability to produce the festival….   Our team has worked tirelessly to find a solution in which the show can go on but unfortunately, we could not make it happen this year. Our dream of producing a 'once in a lifetime experience' has been put on hold as we take the much-needed time to nurture our venue into a premier landmark in Ontario."[1]  While MF Live's initial announcement advised that MF Live would issue full refunds to those who purchased tickets and other credentials, any mention of refunds or other relief has been stricken from the Roxodus website.

61.     Upon information and belief, MF Live's justification for cancelling Roxodus, like Defendants' previous claims regarding the "once in a lifetime experience" they intended to offer, was a lie.

[1]     roxodus.com (last visited July 10, 2019).

62.     Numerous sources—including interviews with Loranger, his former business partner Mike Dunphy ("Dunphy"), MF Live's former Manager of Operations, and others who worked with or for Defendants on Roxodus, as well as third party witnesses and weather service reports—confirm that weather was not the issue.

63.     For example, The Weather Network reports the following total rainfall in Stayner: 114 millimeters (less than 4.5 inches) in April 2019[2]; 87.4 millimeters (less than 3.5 inches) in May 2019[3]; 49.9 millimeters (less than 2 inches) in June 2019[4]; and 8.0 mm (three-tenths of an inch) in July 2019[5].

64.     Upon information and belief, even if there had been "tremendous rainy weather" in the months preceding Roxodus—and there was not—the show still could have gone on.  In an interview with iHeartRADIO published on July 7, 2019, Andreas Tzembelicos, who sold to Defendant TIG a 172-acre parcel of land which was to form part of the Roxodus festival grounds, explained that the land he sold to TIG for Roxodus consisted largely of "asphalt."[6]  Asphalt is not negatively impacted by a few inches of rain.

65.     Indeed, in a video interview with CTV News published on July 8, 2019, Dunphy denied that rainy weather prevented Roxodus, stating: "In my opinion, the festival grounds would

---

[2]     See The Weather Network historical weather data for Stayner, Ontario, Canada for April 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=4&dispt=calendar-container-monthly (last visited July 10, 2019).

[3]     See The Weather Network historical weather data for Stayner, Ontario, Canada for May 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=5&dispt=calendar-container-monthly (last visited July 10, 2019).

[4]     See The Weather Network historical weather data for Stayner, Ontario, Canada for June 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=6&dispt=calendar-container-monthly (last visited July 10, 2019).

[5]     See The Weather Network historical weather data for Stayner, Ontario, Canada for July 2019, available at https://www.theweathernetwork.com/ca/monthly/ontario/stayner?year=2019&month=7&dispt=calendar-container-monthly (last visited September 3, 2019).

[6]     See iHeartRADIO video and report: "Roxodus Music Fest's Mike Dunphy: 'I Took Nothing[,];'" available at http://www.iheartradio.ca/news/roxodus-music-fest-s-mike-dunphy-i-took-nothing-1.9433859 (last visited July 10, 2019).

have been ready to go."[7]  Dunphy further stated that "[a]t no time did I ever think that this was not going to move ahead.  Ever.  I was shocked just like everyone else when the announcement was made that it was not going to move forward."[8]

66.     In a video interview with CityNews, Bill Roberts, former Manager of Operations for Roxodus, also confirmed that Roxodus was cancelled because of Defendants' incompetence and infighting, not the weather.  Mr. Roberts explained: "They didn't have enough time to plan, enough time to get the grounds ready.  They didn't have a proper staff in place."[9]  Mr. Roberts continued, "[w]e needed something like 27 construction office trailers for, like, offices, dressing rooms, wardrobe rooms, stuff like that.  No one had them because they were already booked out.  We needed hundreds and hundreds of pieces of equipment to come in here.  And I was, in the middle of May, trying to order all this stuff, trying to find it."[10]

67.     In addition, upon information and belief, as of the time Roxodus was cancelled: Defendants had failed to secure permits necessary to lawfully convene Roxodus; construction on the Roxodus site was in disarray; necessary site preparation and accommodations equipment had not been secured; and there existed additional substantial logistical obstacles, including that local Highway 26—the sole route into or out of the Roxodus site—was incapable of handling even a fraction of the traffic Roxodus would have created.

68.     Roxodus was not a rain-out, as Defendants claimed.  The truth is that they (a) simply lacked the experience, preparation, work ethic, skill, and dedication necessary to deliver on their promises, and (b) had systematically stripped MF Live of virtually all its assets by transferring them to the Taurus Entities.

---

[7]     *See* CTV News report:  "'I was shocked like everyone else': Roxodus co-creator breaks silence[,]" available at https://barrie.ctvnews.ca/i-was-shocked-like-everyone-else-roxodus-co-creator-breaks-silence-1.4499510 (last visited July 10, 2019).

[8]     *Id*.

[9]     *See* CityNews video and report:  "Roxodus Music Festival doomed months ago: former staffer[,]" available at https://winnipeg.citynews.ca/video/2019/07/09/roxodus-music-festival-doomed-months-ago-former-staffer/  (last visited July 11, 2019).

[10]     *Id*.

69.     In short, in order to unjustly enrich themselves, Defendants lied to the public, Eventbrite, the artists who were to perform at Roxodus, Canadian municipal entities, food and hospitality vendors, and countless others.

III.    **DEFENDANTS' UNLAWFUL PLOT TO ENRICH TAURUS AT THE EXPENSE OF EVENTBRITE, ROXODUS TICKET-BUYERS, AND HUNDREDS OF OTHERS**

70.     Throughout the entirety of the period in which Eventbrite was advancing ticket sales proceeds to MF Live, Defendants were taking steps to route (or re-route) those funds to Taurus.

71.     According to a report published by Grant Thornton, L.P. in its capacity as trustee for the bankruptcy estate of MF Live (the "Trustee's Report"), a total of "approximately $4.9 million" CAD was transferred from MF Live to the Taurus Entities on or after October 10, 2018 (the earliest date for which MF Live banking records were available).  Nearly $4.8 million was transferred from MF Live to TSS; over $100,000 was transferred from MF Live to TP; and several thousand additional dollars were transferred from MF Live to TIG.

72.     Upon information and belief, the overwhelming majority of the nearly $5 million CAD transferred by Defendants out of MF Live and into the Taurus Entities originated with Eventbrite.  In fact, according to the Trustee's Report, MF Live received a total of less than $600,000 CAD from sources other than Eventbrite.

73.     Upon information and belief, including based on materials made available in the course of MF Live's bankruptcy proceedings, Defendants employed one or more of at least the following mechanisms to effect Taurus's receipt of ticket sales advances earmarked by Eventbrite for MF Live.

74.     First, upon information and belief, Loranger, or MF Live personnel acting at Loranger's instruction, directed Eventbrite to deposit advance funds into a bank account that was actually owned and/or otherwise controlled by Taurus.

75.     Contemporaneous records confirm Taurus's ownership of and/or other control over the account into which Eventbrite transferred funds pursuant to MF Live's instruction.  For example, in an email dated January 11, 2019, Taurus Controller Kaley Smith ("Smith")—who, upon information and belief, is not an officer, director, employee, or agent of MF Live—emailed

Eventbrite personnel, stating "[l]ooking at *our* bank account, *we* also haven't received a deposit since January 2. Are you able to look into this for me please?" (Emphases added.)[11] In response, Eventbrite personnel advised that the advance payments from Eventbrite had already exhausted the initial Advance Cap set forth in the Services Agreement. Following this exchange, Loranger executed the Guaranty Agreement, and thereafter took additional steps to induce Eventbrite to advance still more proceeds to MF Live—which were ultimately routed to Taurus.

76. Subsequent actions by Loranger remove any doubt that Defendants intended for Taurus to receive the advance funds paid by Eventbrite. On June 26, 2019—just one week before Roxodus was cancelled—Loranger instructed Eventbrite to make transfers into a different account, this one expressly owned by Taurus.

77. Loranger transmitted this instruction to Eventbrite within *hours* of establishing complete dominion over MF Live's operations and assets by firing the other director of MF Live— who was the only MF Live director not financially interested in or beholden to Taurus. Acting at Loranger's direction, by email to Taurus President Claude Jeddry ("Jeddry") and Accounting Supervisor Janice Allin ("Allin"), MF Live employee Celine Blakely requested "a VOID cheque for the Taurus bank account[,]" explaining that "I need to change all banking in Eventbrite to redirect to the Taurus account, removing the MF Live TD account." Ms. Blakely thereafter advised Loranger, Jeddry, and Allin that payments from Eventbrite "will be deposited to the Taurus account 😊[.]"

78. <u>Second</u>, in addition and/or as an alternative to instructing Eventbrite to send advance payments directly to a Taurus-controlled account, at Defendants' direction, MF Live transferred advance payments to Taurus.

79. For example, on approximately June 28, 2019—just five days before Defendants cancelled Roxodus for bogus reasons and unlawfully refused to refund ticket-buyers—Loranger instructed personnel at TD Canada Trust Bank to release holds on MF Live's account in order to facilitate transfers of hundreds of thousands of dollars to Taurus. Loranger made clear that

---

[11] It appears, moreover, that Smith was authorized by Taurus to communicate with Eventbrite concerning cessation of payments by Eventbrite into "our[,]" that is, Taurus's, bank account. Smith's email states: "Employees of Taurus are to ensure communication contained in this message remain internal unless authorized to share with external recipients…"

Defendants' intent was to promptly forward Eventbrite payments to Taurus as soon as such payments were received. Copying Allin, Taurus's Accounting Supervisor, Loranger wrote: "Thank you Ladies!! **We just need to coordinate it in such a way that as soon as the cheques are cleared as Eventbrite may still be depositing funds regularly. The withdrawal needs to happen quickly**!" (Emphasis added.)

80. Upon information and belief, despite their knowledge that Roxodus would not go forward, Loranger and the other Defendants continued to instruct Eventbrite to keep sending advance payments, while simultaneously going to great lengths to facilitate immediate transfers of those monies to Taurus. In all of their correspondence and other interactions, at no time did Loranger or the other Defendants advise Eventbrite that they were misappropriating MF Live's assets (the advance payments) and funneling those assets to themselves.

81. Upon information and belief, Defendants also knew at all relevant times that neither they nor MF Live would issue refunds to the thousands of ticket-buyers from whom they bilked millions of dollars, or reimburse Eventbrite as required for refunds issued on their behalf. They withheld these facts from Eventbrite, in order to induce Eventbrite to continue advancing ticket sales proceeds to MF Live so that Defendants could continue redirecting those assets to Taurus.

82. Upon information and belief, Defendants' programmatic efforts to divert all advances paid by Eventbrite to Taurus were undertaken intentionally to hinder, delay, and/or defraud Eventbrite.

83. At a minimum, Defendants' systematic transfers of such advance funds left MF Live insolvent (and/or deepened its existing insolvency) and unable to satisfy obligations owed to Eventbrite. Indeed, notwithstanding that Eventbrite had paid nearly $5.2 million CAD to MF Live over a period of months, MF Live's July 10, 2019 bankruptcy Statement of Affairs (signed under oath by Loranger) disclosed total assets of only $154,075 CAD.

## IV. <u>EVENTBRITE'S EFFORTS TO MAKE AGGRIEVED FANS WHOLE</u>

84. On July 3, 2019—within two hours of Defendants' announcement that Roxodus was cancelled—Eventbrite wrote MF Live personnel, including Loranger, stating: "I'm really sorry to hear that you had to cancel the festival. Since you have already received Eventbrite payouts for your

events, you will need to wire transfer the funds you have been paid out to date back to us so we can process the refunds for your event in bulk.  Please initiate a wire transfer to our account (details below).  After funds are sent please provide me with a wire confirmation receipt.  The amount to wire back is **$5,181,502.11 CAD**" (emphasis in original).

85.     In the afternoon of July 3, 2019, Eventbrite's Trust and Safety Team—the internal group tasked with protecting Eventbrite and its users from fraud and other harm—emailed additional MF Live personnel, stating:  "When an event is cancelled, it's important to keep your attendees up to date and decide on a game-plan for handling refunds as soon as possible.  Given the large number of attendees affected we need to come up with a game plan to wire funds back to us, attendee communication and timeline for refunds."  Eventbrite advised that "Refunds need to be timely in order to avoid attendee contact and chargebacks."  Eventbrite instructed MF Live to "1.  **Email your attendees** to notify them of the cancellation and plan for refunds. [Other Eventbrite personnel previously] provided you with template to send to emails to attendees in product regarding the cancellation and outlining the refund plan.  2.  **Refund the orders** [other Eventbrite personnel previously] provided the wire details with the amount owed to Eventbrite.  3.  **Reply to this email** with the timeline for when you will send a more extensive email to attendees regarding refunds and when funds will be wired to Eventbrite to action those refunds on your behalf.  As you may recall, Eventbrite's Attendee Refund Requirements mandate refunds in certain circumstances, including the cancellation of an event.  We understand that cancelling event is not an easy decision to make and we want to work with you to reach a swift and positive resolution" (emphases in original).

86.     In the evening of July 3, 2019, Eventbrite wrote a third time to Loranger and other MF Live personnel, stating: "As we stated before, we would really like to keep this process of getting attendees refunded moving along as quickly as possible. The hope is always that an event organizer facing cancellation will make good on its obligations to consumers who purchased tickets. Is MF Live able do so?  If so, we need the details of planned communications and refund timeline. If not, we need the following details so that we can collaborate together in quickly resolving this to avoid attendee issues.  When are you sending attendee communications regarding refunds? What will these communications say?  Is MF Live solvent?  Does MF Live plan to have Eventbrite issue refunds on

its behalf and will MF Live be sending funds to Eventbrite simultaneously? If not simultaneously, what is the potential timeline we're looking at?"  Eventbrite made clear that "[w]e need to know this information as soon as possible so that we can determine whether and how Eventbrite would step in to issue refunds on MF Live's behalf for the event…. Prompt response to this is very important. I am happy to collaborate with you and your legal team on this, but we'd really like to keep Eventbrite's legal team out of this if possible.  To do that, we need information from you today."

87.     Defendants did not substantively respond to Eventbrite's communications, other than to refer the matter to legal counsel.

88.     On July 5, 2019, Eventbrite issued a letter to Defendants, stating: "We understand that MF Live Inc. and Taurus Site Services Inc. ('Your Company') has now cancelled the events referred to as Roxodus Music Fest 2019…. While we had hoped you would make good on your obligations to consumer who purchased registrations to the Cancelled Event to avoid legal liability for Your Company, its officers, directors, and investors, including, without limitation, consumer lawsuits and attorney general investigations which are fairly typical in these circumstances, **it now seems necessary for Eventbrite to step in and issue refunds on your behalf for the Cancelled Event**. On 7/10/2019, it will be 7 days from the cancellation of the Cancelled Event, providing you far more than enough time to make good on your obligations" (emphasis added).

89.     Invoking Section 4.4(c) of the Merchant Agreement, Eventbrite advised that "**Eventbrite has the authority to issue refunds on your behalf.  We will exercise that right on 7/10/2019 with respect to the cancelled Event…  You will owe Eventbrite $5,181,502.11 CAD following our issuing of all refunds**" (emphasis added).

90.     Eventbrite received no substantive response from Defendants.

91.     On or about July 6, 2019, Eventbrite announced publicly that "[a]fter multiple attempts to communicate and secure funds back from the Roxodus organizers, they have provided no indication that they will refund ticket holders.  We believe attendees deserve to get their money back now, so we have set up an Eventbrite-funded Fan Relief Program to make all Roxodus ticket holders whole while we continue to aggressively pursue the return of funds from the festival's creators.  We

1  are transferring funds to ticket holders immediately and they can expect to see it reflected on their

2  credit card or bank statement within seven business days."

3      92.     As of the date of this filing, Eventbrite has paid approximately $5.4 million CAD

4  (over $4 million USD) of its own funds to make sure its users did not suffer additional harm at

5  Defendants' hands.  Eventbrite is entitled to recover that sum, with interest, and reasonable attorneys'

6  fees, from Defendants.

**FIRST CAUSE OF ACTION**

**(BREACH OF GUARANTY AGREEMENT)**

**(AGAINST ALL DEFENDANTS)**

10      93.     Eventbrite re-alleges and incorporates by reference the above paragraphs of this

11  Complaint as though fully set forth herein.

12      94.     On or about January 29, 2019, Eventbrite and Loranger entered into the Guaranty

13  Agreement.

14      95.     The Guaranty Agreement, and all materials incorporated therein by reference, is a

15  valid and binding contract.  The Guaranty Agreement is subject to agreed-upon confidentiality

16  restrictions.  For that reason, the Agreement is not appended to this Complaint.

17      96.     Eventbrite did all, or substantially all, of the material things that the Guaranty

18  Agreement required it to do.  To the extent Eventbrite did not perform any material obligation under

19  the Guaranty Agreement, it was excused from having to do so and/or such obligation was waived by

20  Loranger.  Eventbrite therefore satisfied any and all conditions required under the Guaranty

21  Agreement for Loranger's performance.

22      97.     Loranger failed to perform his obligations under the Guaranty Agreement, and/or

23  engaged in conduct that was prohibited by the Guaranty Agreement.  Among other breaches

24  occurring within the four years preceding this Complaint, Loranger failed to reimburse Eventbrite for

25  substantial monies paid by Eventbrite to users who purchased Roxodus credentials that were rendered

26  worthless due to Defendants' decision to cancel Roxodus.

27      98.     Eventbrite was harmed as a result of Loranger's breaches, in an amount to be proved

28  at trial.

99.     Loranger's breach of contract was a substantial factor in causing Eventbrite's harm.

100.     Eventbrite is therefore entitled to recover all damages attributable to Loranger's breach, with interest thereon.

101.     Eventbrite is further entitled to recover from Loranger its reasonable attorneys' fees incurred in connection with this action, pursuant to the Services Agreement.

102.     Eventbrite is entitled, moreover, to collect damages, interest, and reasonable attorneys' fees from the other Defendants, including on the ground that Loranger acted as agent, on behalf, and/or in furtherance of the interests of each such Defendant in entering into and then subsequently breaching the Guaranty Agreement, as evidenced by, among other things, Loranger's efforts to divert ticket sales proceeds to an account held by certain of the Taurus Entities.

## SECOND CAUSE OF ACTION

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING IN GUARANTY AGREEMENT)

### (PLEADED IN THE ALTERNATIVE, AGAINST ALL DEFENDANTS)

103.     Eventbrite re-alleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

104.     On or about January 29, 2019, Eventbrite and Loranger entered into the Guaranty Agreement.

105.     The Guaranty Agreement, and all materials incorporated therein by reference, is a valid and binding contract.  The Guaranty Agreement is subject to agreed-upon confidentiality restrictions.  For that reason, the Agreement is not appended to this Complaint.

106.     Eventbrite did all, or substantially all, of the material things that the Guaranty Agreement required it to do.  To the extent Eventbrite did not perform any material obligation under the Guaranty Agreement, it was excused from having to do so and/or such obligation was waived by Loranger.  Eventbrite therefore satisfied any and all conditions required under the Guaranty Agreement for Loranger's performance.

107.     Within the four years preceding this Complaint, Loranger unfairly interfered with Eventbrite's right to receive the benefits of the Guaranty Agreement, including by failing to

1    reimburse Eventbrite for substantial monies paid by Eventbrite to users who purchased Roxodus

2    credentials that were rendered worthless due to Defendants' decision to cancel Roxodus.

3        108.    Eventbrite was harmed as a result of Loranger's breaches, in an amount to be proved

4    at trial.

5        109.    Loranger's conduct was a substantial factor in causing Eventbrite's harm.

6        110.    Eventbrite is therefore entitled to recover all damages attributable to Loranger's

7    breach, with interest thereon.

8        111.    Eventbrite is further entitled to recover from Loranger its reasonable attorneys' fees

9    incurred in connection with this action, pursuant to the Guaranty Agreement.

10       112.    Eventbrite is entitled, moreover, to collect damages, interest, and reasonable attorneys'

11   fees from the other Defendants, including on the ground that Loranger acted as agent, on behalf,

12   and/or in furtherance of the interests of each such Defendant in entering into and then subsequently

13   breaching the Guaranty Agreement, as evidenced by, among other things, Loranger's efforts to divert

14   ticket sales proceeds to an account held by certain of the Taurus Entities.

**THIRD CAUSE OF ACTION**

**(FRAUDULENT TRANSFER—ACTUAL INTENT TO DEFRAUD)**

**(AGAINST ALL DEFENDANTS)**

18       113.    Eventbrite re-alleges and incorporates by reference the above paragraphs of this

19   Complaint as though fully set forth herein.

20       114.    Pursuant to the Services Agreement, Eventbrite has a right to payment from MF Live,

21   including at least the right to be reimbursed for millions of dollars in refunds Eventbrite issued to

22   ticket-buyers on behalf of MF Live following Defendants' cancellation of Roxodus and wrongful

23   refusals to issue such refunds directly as legally required.

24       115.    Defendants transferred virtually all of the advance ticket sales proceeds paid to MF

25   Live by Eventbrite pursuant to the Services Agreement and Guaranty Agreement.  As set forth above,

26   Loranger directed and/or otherwise facilitated such transfers on behalf, in furtherance of the interests,

27   and as agent of the other Defendants, including in his role and capacity of sole director and/or

28   controlling shareholder of each of the Taurus Entities.  Additional Taurus personnel participated

directly in effecting and/or facilitating these transfers, including by providing banking information and by dialoguing directly with Eventbrite to direct and/or redirect advance funds into accounts owned and/or otherwise controlled by Taurus.

116.    Upon information and belief, Defendants effected these transfers with the intent to hinder, delay, and/or defraud Eventbrite.  Among other facts reflecting Defendants' intent in this regard:  (a) the transfers were made by one entity dominated by Loranger to other entities dominated by Loranger; (b) given Loranger's complete dominion over each of the Taurus Entities to whom Defendants effected transfers, Loranger retained possession and/or control of the advance ticket sales proceeds paid by Eventbrite to MF Live; (c) particularly in the days leading up to their cancellation of Roxodus, Defendants took steps to expedite and to conceal their transfers of funds from MF Live to Taurus; (d) upon information and belief, Defendants knew at the time of at least some of the transfers to Taurus that Roxodus would not go forward, that it would be necessary to issue refunds pursuant to the Services Agreement and Guaranty Agreement, and that they would not be issuing refunds or reimbursing Eventbrite for refunds issued on their behalf; (e) Defendants caused MF Live to transfer to Taurus substantially all of MF Live's assets, as confirmed by MF Live's bankruptcy Statement of Affairs (signed under oath by Loranger) disclosing approximately $154,000 in total remaining assets following such transfers; (f) Defendants' transfers caused MF Live to become insolvent and/or deepened MF Live's existing insolvency; and (g) at least some of the transfers from MF Live to Taurus occurred close in time to MF Live's incurrence of substantial debt to Eventbrite and others. Eventbrite anticipates that discovery and further investigation will reveal additional evidence of Defendants' actual intent to delay, hinder, and/or defraud Eventbrite.

117.    Eventbrite has been harmed by Defendants' conduct.

118.    Defendants' conduct was a substantial factor in causing Eventbrite's harm, as well as a direct and proximate cause of such harm.

119.    Defendants' conduct was undertaken with malice, oppression, and/or fraud, justifying the imposition of punitive damages serve to punish Defendants and to deter such reprehensible conduct by others.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FOURTH CAUSE OF ACTION**

**(CONSTRUCTIVE FRAUDULENT TRANSFER)**

**(PLEADED IN THE ALTERNATIVE, AGAINST ALL DEFENDANTS)**

120.    Eventbrite re-alleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

121.    Pursuant to the Services Agreement, Eventbrite has a right to payment from MF Live, including at least the right to be reimbursed for millions of dollars in refunds Eventbrite issued to ticket-buyers on behalf of MF Live following Defendants' cancellation of Roxodus and wrongful refusals to issue such refunds directly as legally required.

122.    Defendants transferred virtually all of the advance ticket sales proceeds paid to MF Live by Eventbrite pursuant to the Services Agreement and Guaranty Agreement.  As set forth above, Loranger directed and/or otherwise facilitated such transfers on behalf, in furtherance of the interests, and as agent of the other Defendants, including in his role and capacity of sole director and/or controlling shareholder of the Taurus Entities.  Additional Taurus personnel participated directly in effecting and/or facilitating these transfers, including by providing banking information and by dialoguing directly with Eventbrite to direct and/or redirect advance funds into accounts owned and/or otherwise controlled by Taurus.

123.    Upon information and belief, MF Live did not receive a reasonably equivalent value in exchange for the millions in funds Defendants transferred to Taurus.  At the time of each such transfer, upon information and belief, MF Live was in business and/or engaged or about to become engaged in transactions when its remaining assets were unreasonably small for the business or transaction.  In addition, upon information and belief, MF Live incurred debts and/or intended to incur debts beyond its ability to repay as they became due.  Moreover, upon information and belief, MF Live believed or reasonably should have believed that it would had incurred or would incur debts beyond its ability to pay them as they came due.

124.    According to materials made available in MF Live's bankruptcy proceedings, including the Statement of Affairs signed under oath by Loranger, MF Live was insolvent at the time of the transfers effected by Defendants, or became insolvent as a result of such transfers.

125.   Upon information and belief, Loranger (in his capacity as sole director and/or controlling shareholder of MF Live) knew or reasonably should have known the foregoing facts at all relevant times.

126.   Given Loranger's role and capacity as sole director and/or controlling shareholder of each of the Taurus Entities, each of the Taurus Entities knew or reasonably should have known the foregoing facts at all relevant times.

127.   Eventbrite has been harmed by Defendants' conduct.

128.   Defendants' conduct was a substantial factor in causing Eventbrite's harm, as well as a direct and proximate cause of such harm.

129.   Defendants' conduct was undertaken with malice, oppression, and/or fraud, justifying the imposition of punitive damages to punish Defendants and to deter such reprehensible conduct by others.

## FIFTH CAUSE OF ACTION
## (FRAUDULENT MISREPRESENTATION)
## (AGAINST ALL DEFENDANTS)

130.   Eventbrite re-alleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

131.   Eventbrite and Loranger, both personally and in his capacity as sole director and/or controlling shareholder of MF Live, were in a contractual business relationship.  For example, Loranger executed both the Services Agreement and the Guaranty Agreement in which he made certain representations and commitments to Eventbrite on behalf of himself and MF Live.

132.   In negotiating and executing the Services Agreement and Guaranty Agreement, Loranger represented to Eventbrite that Roxodus would take place as scheduled and that MF Live and/or he (a) would issue refunds to ticket-buyers in the event Roxodus was cancelled or (b) would promptly reimburse Eventbrite in the event Eventbrite issued refunds on their behalf.

133.   Upon information and belief, at the time he made such representations, Loranger knew that they were false and/or made them recklessly and without regard for their truth.  For example, upon information and belief, immediately after making such representations, Loranger, acting on

behal, in furtherance of the interests, and as agent of each of the Taurus Entities, effected and/or facilitated transfers of MF Live's assets to the Taurus Entities. By removing such assets from MF Live and delivering them to Taurus, Loranger made it effectively impossible for MF Live to put on the Roxodus festival, to issue refunds to aggrieved ticket-buyers, or to reimburse Eventbrite for refunds issued on its behalf.

134. Moreover, contrary to the express representations he made to Eventbrite, Loranger has refused to fulfill his obligations under the Services Agreement or Guaranty Agreement, and instead drove MF Live into bankruptcy and ignored Eventbrite's efforts to resolve this dispute without litigation.

135. Upon information and belief, including the nature, timing, and extent of the transfers effected and/or facilitated by Defendants, Loranger intended that Eventbrite rely on his false representations. Eventbrite anticipates that discovery and further investigation will reveal additional evidence concerning Loranger's knowledge and intent.

136. Loranger engaged in the foregoing on behalf, in furtherance of the interests, and as agent of the other Defendants. Upon information and belief, Loranger's misrepresentations were an essential part of Defendants' plot to enrich the Taurus Entities at the expense of Eventbrite and others.

137. Eventbrite reasonably relied on Loranger's representations.

138. Eventbrite was harmed as a result of Loranger's conduct, undertaken on behalf, in furtherance of the interests, and as agent of the other Defendants.

139. Eventbrite's reliance on Loranger's misrepresentations was a substantial factor in causing Eventbrite's harm, as well as a direct and proximate cause of such harm.

140. Defendants' conduct was undertaken with malice, oppression, and/or fraud, justifying the imposition of punitive damages to punish Defendants and to deter such reprehensible conduct by others.

## SIXTH CAUSE OF ACTION

## (NEGLIGENT MISREPRESENTATION)

## (PLEADED IN THE ALTERNATIVE, AGAINST ALL DEFENDANTS)

141.    Eventbrite re-alleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

142.    Eventbrite and Loranger, both personally and in his capacity as sole director and/or controlling shareholder of MF Live, were in a contractual business relationship.  For example, Loranger executed both the Services Agreement and the Guaranty Agreement in which he made certain representations and commitments to Eventbrite on behalf of himself and MF Live.

143.    In negotiating and executing the Services Agreement and Guaranty Agreement, Loranger represented to Eventbrite that Roxodus would in fact take place and that MF Live and/or he (a) would issue refunds to ticket-buyers in the event Roxodus was cancelled or (b) would promptly reimburse Eventbrite in the event Eventbrite issued refunds on their behalf.

144.    Upon information and belief, such representations were not true at the time they were made, as shown by the facts and circumstances alleged above.

145.    To the extent Loranger honestly believed that his representations were true at the time he made them, Loranger had no reasonable grounds for such belief.

146.    Upon information and belief, including the nature, timing, and extent of the transfers effected and/or facilitated by Defendants, Loranger intended that Eventbrite rely on his representations.  Eventbrite anticipates that discovery and further investigation will reveal additional evidence concerning Loranger's knowledge, beliefs, and intent.

147.    Loranger engaged in the foregoing on behalf, in furtherance of the interests, and as agent of the other Defendants.  Upon information and belief, Loranger's misrepresentations were an essential part of Defendants' plot to enrich the Taurus Entities at the expense of Eventbrite and others.

148.    Eventbrite reasonably relied on Loranger's representations.

149.    Eventbrite was harmed as a result of Loranger's conduct, undertaken on behalf, in furtherance of the interests, and as agent of the other Defendants.

150.    Eventbrite's reliance on Loranger's misrepresentations was a substantial factor in causing Eventbrite's harm, as well as a direct and proximate cause of such harm.

151.    Defendants' conduct was undertaken with malice, oppression, and/or fraud, justifying the imposition of punitive damages serve to punish Defendants and to deter such reprehensible conduct by others.

**SEVENTH CAUSE OF ACTION**

**(FRAUDULENT CONCEALMENT)**

**(AGAINST ALL DEFENDANTS)**

152.    Eventbrite re-alleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

153.    Eventbrite and Loranger, both personally and in his capacity as sole director and/or controlling shareholder of MF Live, were in a contractual business relationship.  For example, Loranger executed both the Services Agreement and the Guaranty Agreement in which he made certain representations and commitments to Eventbrite on behalf of himself and MF Live.

154.    In negotiating and executing the Services Agreement and Guaranty Agreement, Loranger represented to Eventbrite that Roxodus would in fact take place and that MF Live and/or he (a) would issue refunds to ticket-buyers in the event Roxodus was cancelled or (b) would promptly reimburse Eventbrite in the event Eventbrite issued refunds on their behalf.

155.    Loranger intentionally concealed other material facts, including in such a manner as to render the foregoing representations incomplete, inaccurate, and/or otherwise deceptive.  For example, even as he continued to instruct Eventbrite to advance ticket sales proceeds, Loranger concealed that Roxodus would not go forward as planned but rather would be cancelled; that he and the other Defendants were transferring assets from MF Live to Taurus such that MF Live would be financially and logistically incapable of putting on the Roxodus festival, issuing refunds to aggrieved ticket-buyers, or reimbursing Eventbrite for refunds issued on its behalf; and that Loranger would not personally reimburse Eventbrite, pursuant to the Guaranty Agreement, for refunds issued on behalf of MF Live.

156.    Eventbrite was unaware of the facts concealed by Loranger.

157.     Upon information and belief, including the nature, timing, and extent of the transfers effected and/or facilitated by Defendants, Loranger intended to deceive Eventbrite by concealing such facts.  Eventbrite anticipates that discovery and further investigation will reveal additional evidence concerning Loranger's knowledge and intent.

158.     Had the concealed facts been disclosed, Eventbrite reasonably would have acted differently, including by not making transfers of advance ticket sales proceeds pursuant to Loranger's directions, taking steps to reverse transfers already made, and/or taking other steps to avoid or minimize harm.

159.     Eventbrite was harmed as a result of Loranger's conduct, undertaken on behalf, in furtherance of the interests, and as agent of the other Defendants.

160.     Eventbrite's reliance on Loranger's misrepresentations was a substantial factor in causing Eventbrite's harm, as well as a direct and proximate cause of such harm.

161.     Defendants' conduct was undertaken with malice, oppression, and/or fraud, justifying the imposition of punitive damages to punish Defendants and to deter such reprehensible conduct by others.

## EIGHTH CAUSE OF ACTION

### (COMMON COUNT:  MONEY HAD AND RECEIVED; DEMAND FOR ACCOUNTING AND CONSTRUCTIVE TRUST)

### (AGAINST ALL DEFENDANTS)

162.     Eventbrite re-alleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

163.     Pursuant to the Services Agreement, Guaranty Agreement, and additional assurances provided by and/or on behalf of Loranger, Eventbrite transferred millions of dollars to MF Live on the express conditions that those funds either (a) be refunded directly to ticket-buyers in the event Roxodus was canceled or (b) be refunded to Eventbrite in the event that it issued refunds to ticket-buyers on MF Live's behalf.  As such, in the event of a cancellation of Roxodus, MF Live held these funds for the benefit of Eventbrite and/or ticket-buyers.

164.   Roxodus was canceled, and Eventbrite issued refunds to ticket-buyers on behalf of MF Live.  As such, Eventbrite became legally entitled to receive the monies previously advanced to MF Live.

165.   As set forth above, however, Defendants transferred substantially all of those funds from MF Live to Taurus (entities of which Loranger was the sole director and/or controlling shareholder) such that they were not returned to or otherwise used for the benefit of Eventbrite as legally required.

166.   As of the date of this pleading, Defendants still have not given these funds to Eventbrite.

167.   Accordingly, Eventbrite is entitled to (a) an accounting to determine whether and to what extent Defendants have used the subject funds for other purposes, such as to purchase additional assets or benefits; and (b) an Order finding and directing that Defendants are constructive trustees, for the benefit of Eventbrite, of such funds and/or other assets and/or other benefits acquired by Defendants by use or other virtue of such funds.

## **PRAYER FOR RELIEF**

WHEREFORE, Eventbrite respectfully prays for relief as follows:

(a)   That the Court enter judgment in favor of Eventbrite, and against each Defendant, on each cause of action;

(b)   An award of damages adequate to compensate Eventbrite for its losses, together with pre- and post-judgment interest and costs, in an amount according to proof;

(c)   An Order directing Defendants to submit to an accounting;

(d)   An Order imposing a constructive trust, for the benefit of Eventbrite, over monies which originated from Eventbrite, and/or assets or other benefits acquired by Defendants by use or other virtue of such funds;

(e)   An award of punitive and/or exemplary damages;

(f)   An award of attorneys' fees and costs; and

(g)   Such other costs and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Eventbrite hereby demands a trial by jury as to all issues so triable in this action.


Date:  September 3, 2019                    Respectfully submitted,

SINGER CASHMAN LLP

By: _____
       Adam S. Cashman
       Doug Tilley
       *Attorneys for Eventbrite, Inc.*